## STATE OF CONNECTICUT *v.* RITA DECARO
### (SC 15891)

Borden, Norcott, Katz, Palmer and McDonald, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued January 21, 1999—officially released February 29, 2000

*Roy S. Ward,* with whom, on the brief, was *Philip Russell,* for the appellant (defendant).

*Lisa Herskowitz,* assistant state's attorney, with whom, on the brief, were *Eugene Callahan,* state's attorney, and *Robert Katz,* senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Rita DeCaro, guilty of nine counts of forgery in the second degree in violation of General Statutes § 53a-139 (a),[1] and not guilty of three counts of larceny in the second degree in violation of General Statutes § 53a-123 (a) (4).[2] The

---

[1] General Statutes § 53a-139 (a) provides in relevant part: "A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed . . . (2) a public record or an instrument filed or required or authorized by law to be filed in or with a public office or public servant; or (3) a written instrument officially issued or created by a public office, public servant or governmental instrumentality . . . ."

The defendant was convicted of eight counts of forgery in the second degree under subdivision (2) of § 53a-139 (a), and one count of forgery in the second degree under subdivision (3) of § 53a-139 (a).

[2] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and . . . (4) the property is obtained by defrauding a public community, and the value of such property is two thousand dollars or less . . . ."

Public Acts 1997, No. 97-180 made an amendment to § 53a-123 (a) that is not relevant to this appeal. For convenience, we refer to the current revision of § 53a-123 (a) throughout this opinion.

General Statutes § 53a-119 provides in relevant part: "Larceny defined. A person commits larceny when, with intent to deprive another of property

trial court rendered judgment in accordance with the jury verdict,[3] and the defendant appealed.[4] On appeal, the defendant claims that: (1) the evidence was insufficient to sustain her forgery convictions; (2) her forgery convictions cannot stand because they are inconsistent with her acquittal on the larceny charges; (3) the trial court improperly denied her request for a mistrial or, alternatively, for a curative instruction, in response to allegedly improper comments the prosecutor had made during closing arguments; and (4) the trial court violated her sixth amendment rights to confront witnesses and to compulsory process[5] by quashing a portion of a subpoena duces tecum that she had served on her former supervisor seeking documents relevant to the case. Although we reject the defendant's first three claims, we conclude that the trial court improperly quashed a portion of the subpoena duces tecum issued by the defendant to her former supervisor. On the current record, however, we cannot ascertain whether that impropriety violated the defendant's rights under the

or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to . . .

"(6) Defrauding of public community. A person is guilty of defrauding a public community who . . . (C) as an officer or agent of any public community, with intent to prejudice it, appropriates its property to the use of any person or draws any order upon its treasury or presents or aids in procuring to be allowed any fraudulent claim against such community. For purposes of this subdivision such order or claim shall be deemed to be property. . . ."

Although Public Acts 1995, No. 95-246, § 1, made amendments to § 53a-119, those amendments are not relevant to this appeal. For convenience, we refer to the current revision of § 53a-119.

[3] The court sentenced the defendant to nine concurrent prison terms of two years each, execution suspended, and two years probation.

[4] The defendant appealed from the judgment of conviction to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . [and] to have compulsory process for obtaining witnesses in his favor . . . ."

sixth amendment and, if so, whether the harm stemming from the constitutional violation requires a new trial. Accordingly, we remand the case to the trial court for further proceedings regarding that issue.

The jury reasonably could have found the following facts. At all relevant times, the defendant worked as an account clerk for the Westport building department (department). The department processes all applications for building permits. While the defendant was employed at the department, her immediate supervisor was the Westport building official, Stephen Smith. Smith, in turn, reported to the fire chief, Richard Gough. Among other tasks, the defendant collected permit fees.[6] She also processed the permit applications on the department's computer and printed out each permit. A computer generated permit would not become valid, however, until it was signed by one of the department building officials. Hard copies of all signed permits were kept in manila file folders in the department offices. The defendant also prepared periodic reports for the town controller's office accounting for the permits issued and funds collected, by check or cash, over a particular time period, usually once every one or two weeks. These reports were used by the town controller, Donald Miklus, to prepare the fees for deposit. When the defendant went on vacation or was ill, no reports were generated until her return. Smith did not review the reports the defendant had prepared for Miklus.

---

[6] The fee for a permit was $10 for the first $1000 of the project's value, and $8 for each additional $1000 of value. Applicants normally paid fees by check. Occasionally, however, an applicant paid cash. Historically, subcontractors paid separate fees for permits based upon the value of their part of the construction project. When Smith became the Westport building official in 1990, he instituted a new policy requiring the general contractor to pay a larger permit fee up front to cover the value of anticipated subcontractor work. As a result of this prepayment, subcontractor permits for the same project would show no fee.

The defendant often complained about problems that she was having with the computer program, including inaccuracies in the function used to generate the reports for Miklus. Specifically, she complained that when she created these reports, permits often would be missing from the list. The defendant complained about this problem to Gough, who told her to type in the missing permits.[7] The defendant also complained that she had difficulty retrieving information regarding permits from prior fiscal years.

In April, 1994, an individual contacted the controller's office about a check that his bank had returned. Although the individual had issued the check to the department in October, 1993, in payment of a permit fee, the check had not been presented for payment to his bank until April, 1994. While investigating the reason for this delay, the controller's office discovered that a substantial number of checks deposited during certain periods did not correspond to the permits listed on the reports for those periods. According to Smith, the checks should have been deposited during the same period that the permits were issued. The controller's office also found numerous instances in which a permit was listed on a report for a particular period, but the fee for the permit had been covered by a check in the name of someone other than the permit applicant, and the check corresponding to the permit had been deposited in a later period. Miklus informed both Smith and Gough of these irregularities and also expressed his concern that unusually small amounts of cash had been included in recent department deposits. Neither Smith nor Gough previously had been aware of the existence of any undeposited cash or checks, or of any discrepancies between the period in which a particular fee was

---

[7] There also was evidence, however, that Gough did not experience this problem when he sought to retrieve such a report from the computer.

received and the period in which that fee had been deposited.

After the close of business on or about May 11, 1994, Gough conducted a search of the department offices. During the course of the search, he found an envelope in the defendant's desk containing a steno pad and approximately eighty-six checks totaling $2593. The checks bore dates ranging from December, 1993, through April, 1994. Gough also found cash in the defendant's desk in two separate locations totaling $82 and $30, respectively.[8]

During the next reporting period, Miklus and Gough noted that $112 in cash had been received by the defendant in payment for permit fees. Miklus and Gough waited to see if the cash and checks that Gough had discovered in the defendant's desk would be included in the defendant's next report. When the defendant had failed to include the checks or cash in her report, Gough, Smith and Miklus arranged to meet with the defendant. At that meeting, which occurred on May 20, 1994, the defendant was asked why the checks did not correspond to the permits listed on the report. The defendant said that she was unaware of the discrepancy and attributed any discrepancy to her heavy workload.[9] When asked about the cash and why it was not deposited, the defendant said that she must have used it to make change for someone who had overpaid with a check. The defendant also said that she was unaware of any undeposited checks from earlier reporting periods. She

[8] Cash amounts of $82 and $30 were submitted to the defendant for two permits that had been issued during the relevant reporting period. The cash, however, was not included in the deposit for that period, and the state sought to establish that the defendant had stolen the $82 and $30. Those alleged thefts comprise two of the three larceny counts contained in the information. The third larceny count was predicated upon the state's claim that the defendant had collected and misappropriated an additional $30 cash permit fee.

[9] It was undisputed that the defendant had a very heavy workload.

indicated that the only checks remaining in the department offices would be those checks that had been received during the current reporting period. Miklus then suggested that they search the department offices to see whether there were any checks there that should have been deposited during a prior period.

Gough, Smith and Miklus gave the defendant an opportunity to look for such checks, but she claimed to be unable to find any. Gough then retrieved from the defendant's desk the envelope that he had found earlier, containing the checks and a steno pad. The defendant tried to take the envelope from Gough, but he handed it to Miklus. The defendant was asked why the checks were in the envelope. She stated that they corresponded to permits not yet reflected in her reports. Miklus retained the checks and the pad, then asked the defendant if she could produce the permits corresponding to the checks in the envelope. The defendant agreed to do so, and some time thereafter, provided Gough with thirty-two documents that she claimed to be the corresponding permits. None of the thirty-two documents, however, was signed by a building official.

Gough and the controller's office reviewed the thirty-two documents, which reflected a total of $3140 in fees, to determine whether they were legitimate and whether they corresponded to the checks found in the defendant's desk. On September 30, 1994, Gough and Miklus held another meeting with the defendant at which they reported their findings regarding the documents. Although their review indicated that some of the permits were legitimate in that they had not been issued previously, others related to projects for which the general contractor already had prepaid all applicable fees. Specifically, approximately ten of the permits, repre-

senting $326 worth of fees,[10] corresponded to work for which permits previously had been issued at no fee as a result of general contractors' prepayments for anticipated subcontractor work. Thus, there was no reason for such permits to have been issued. Moreover, none of the checks found in the defendant's desk matched any of the thirty-two permits.

When asked for an explanation, the defendant reported that she had not checked the manila file folders in preparing the documents. She indicated that, instead, she only had consulted the computer, and provided permits that, to the best of her knowledge, had not yet been issued. The defendant also was asked why there had been so little cash deposited recently.[11] The defendant responded only that the department received cash in "dribs and drabs." Regarding the cash fees that the department had received in May, 1994, the defendant could not explain why that cash had not been deposited.

In February, 1995, the police questioned the defendant about the various discrepancies and irregularities. Thereafter, the defendant went to Miklus' deputy, John Kondub, to point out that there was cash in the office, in three different locations, that had been received in payment for photocopying department records. She told Kondub that she "wasn't going to take the blame for this money being here." Kondub then collected and counted the cash, which totaled $367.85. The defendant also told Kondub that Smith knew about the cash, that Smith had used some of it for a building officials' meet-

---

[10] Eight of these permits form the basis for eight of the forgery counts. The ninth forgery count involves a signed subcontractor permit for which the subcontractor reported paying $30 in cash. The signed permit had the fee information crossed out and the term "prepaid" written in by the defendant.

[11] Over a two year period, the amount of cash included in the department's deposits had decreased substantially. In fiscal year 1991, $261,000 in fees were received by the department, of which $1986 were in cash. By contrast, in fiscal year 1993, $358,000 in fees were collected, consisting of only $7 in cash.

ing and, finally, that Smith had authorized the defendant to take some money from the fund to buy flowers for a sick volunteer. Smith stated that he was aware of the cash payments for photocopying, but that he had assumed that the cash was deposited properly, on a regular basis. Smith also acknowledged that he had authorized the defendant to pay for the flowers out of the cash that had been collected for photocopying fees.

The defendant was terminated from her employment with the department on April 18, 1995. Gough then hired a temporary secretary to go through the manila permit files and prepare a report for fiscal year 1993, listing, inter alia, each permit that had been issued, the issuance date, the fee charged, and whether the file copy had been signed. The report indicated that 2447 permits had been issued for a total of $351,911 in fees. For the same fiscal year, $358,557 in fees had been deposited, representing an excess of approximately $6500.

Following a jury trial, the defendant was convicted of nine counts of forgery in the second degree and acquitted of three counts of larceny in the second degree. On appeal, the defendant claims, first, that the evidence is insufficient to sustain a finding of guilt beyond a reasonable doubt on the forgery charges. Second, the defendant claims that the trial court improperly accepted the jury's verdict of guilty on the forgery charges because that finding is inconsistent with the jury's finding of not guilty on the larceny charges. The defendant next claims that she is entitled to a new trial based on certain allegedly improper comments made by the prosecutor during his closing arguments to the jury. Finally, the defendant contends that the trial court improperly quashed a portion of a subpoena duces tecum served on Smith, her former supervisor, in violation of her rights to confrontation and compulsory process under the sixth amendment. We reject the defendant's first three contentions. The record, how-

ever, is inadequate to determine the validity of the defendant's sixth amendment claim, and, consequently, we remand the case for an evidentiary hearing on that claim.

I

The defendant first claims that the evidence was insufficient to sustain the jury's verdict of guilty on the forgery charges. Specifically, she contends that the state failed to prove the element of intent required for a conviction of forgery in the second degree. We reject the defendant's claim.

"In reviewing a sufficiency of the evidence claim, we apply a [two part test]. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 247 Conn. 616, 620–21, 725 A.2d 306 (1999).

Furthermore, "[i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Torres*, 242 Conn. 485, 489, 698 A.2d 898 (1997). Indeed, "direct evidence of the accused's state of mind

is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Hill*, 237 Conn. 81, 104–105, 675 A.2d 866 (1996).

Finally, "[a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, supra, 247 Conn. 621.

The defendant does not challenge the sufficiency of the evidence establishing that she altered public documents. She claims, rather, that the state had failed to prove that she did so with intent to "defraud, deceive or injure" as required under § 53a-139 (a). Specifically, the defendant asserts that, because she was found not guilty with respect to the larceny charges, the state had failed to establish that she had altered the documents for the purpose of covering up a larceny or larcenies. The defendant further maintains that, in the absence of sufficient proof of an intent to conceal the theft of town funds, the evidence was inadequate to support

the conclusion that she had altered the documents with an intent to defraud, deceive or injure the town. At most, the defendant asserts, her alteration of the documents resulted from "sloppiness, disorganization, and even negligence."

We are not persuaded by the defendant's argument. From the evidence, the jury reasonably could have determined that the defendant altered the documents for the purpose of hiding the fact that, because of her sloppiness and disorganization, she consistently had failed to deposit the permit fees in a timely manner and, furthermore, that she had not maintained a proper accounting of the permits or the payments. For example, the evidence revealed that, at her May 20, 1994 meeting with Gough, Smith and Miklus, the defendant denied that she possessed any undeposited checks from earlier reporting periods. Gough, however, retrieved an envelope from the defendant's desk, in her presence, containing a number of such checks. When confronted with the checks, the defendant explained that they corresponded to permits that were not reflected in her report. Miklus retained the checks and asked the defendant for the corresponding permits. Thereafter, the defendant produced a number of permits that she claimed corresponded to the checks that Gough had taken from her desk. These permits, however, were unrelated to the undeposited checks that Gough had discovered. In addition, those permits had not been signed by a building official. Thus, the jury reasonably could have found that the defendant had falsely made, completed or altered the permits intending to convince her superiors that, contrary to fact, she possessed permits that corresponded to the undeposited checks. The evidence, therefore, when viewed in the light most favorable to sustaining the verdict, supports the conclusion that the defendant had made or altered the permits

with the intent to deceive.[12] Accordingly, we reject the defendant's claim of evidentiary insufficiency.

## II

The defendant next claims that the trial court improperly accepted the jury's verdict of guilty with respect to the forgery charges because that portion of the verdict is inconsistent with the jury's decision to acquit the defendant on the larceny charges. We disagree.

The defendant first claims that the jury's findings were incompatible as a factual matter. The defendant concedes, however, that a factually inconsistent verdict will not be overturned on appeal. "On several occasions, this court has refused to reverse a verdict of guilty on one count where that verdict appeared to be inconsistent with a verdict of acquittal on another count. . . . The law permits inconsistent verdicts because of the recognition that jury deliberations necessarily involve negotiation and compromise. . . . [I]nconsistency of the verdicts is immaterial. . . . As Justice Holmes long ago observed in the case of *Dunn* v. *United States*, 284 U.S. 390, 393–94, 52 S. Ct. 189, 76 L. Ed. 356 (1932): The most that can be said in such cases [i.e., of inconsistent verdicts] is that the verdict shows that either in the

---

[12] We note that, under § 53a-139 (a), proof of an intent to deceive is sufficient for a conviction even if not done in a manner calculated to defraud or to cause injury: "The ordinary meaning of the phrase 'to deceive' is 'to cause to believe the false. . . . Deceive indicates an inculcating of one so that he takes the false as true, the unreal as existent, the spurious as genuine . . . .' Webster's Third New International Dictionary." *State* v. *Yurch*, 37 Conn. App. 72, 80–81, 654 A.2d 1246, appeal dismissed, 235 Conn. 469, 667 A.2d 797 (1995). Thus, unlike the terms "defraud" and "injure," which also satisfy the mens rea requirement of § 53a-139 (a); see footnote 1 of this opinion; the term "deceive" does not require an intent to cause injury. *State* v. *Yurch*, supra, 80–81 (construing identical language of General Statutes § 53a-140, forgery in third degree); see also *State* v. *Edwards*, 201 Conn. 125, 151–52, 513 A.2d 669 (1986) (evidence that defendant gave false name for purpose of concealing his criminal record sufficient to satisfy intent element of § 53a-139 [a] [2]).

acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity. . . . That the verdict may have been the result of compromise, or a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (Citations omitted; internal quotation marks omitted.) *State* v. *Bailey*, 209 Conn. 322, 344–45, 551 A.2d 1206 (1988).

Despite our settled law regarding the validity of factually inconsistent verdicts, the defendant appears to argue that, in light of the state's theory of the case and the evidence adduced by the state in support thereof, her conviction on the forgery charges *logically* cannot be squared with her acquittal on the larceny charges. See *State* v. *Manning*, 162 Conn. 112, 123, 291 A.2d 750 (1971) ("[w]hile an inconsistent verdict is not objectionable in itself, its inconsistency may be considered insofar as it supports a claim that the jury's conclusion was not reasonably and logically reached"). Specifically, the defendant contends that the jury's finding of not guilty on the larceny charges indicates that the state had failed to establish that she had altered any documents "with intent to defraud, deceive or injure another"; General Statutes § 53a-139 (a); an element of the forgery charges of which she was found guilty. We reject this claim. As we previously have indicated; see part I of this opinion; the evidence was sufficient to establish that the defendant had violated § 53a-139 by altering public documents in an effort to conceal her inadequate accounting and record keeping, and not necessarily to conceal larcenous conduct. Thus, the jury reasonably could have concluded that the state proved beyond a reasonable doubt that the defendant had made or altered the per-

mits with intent to deceive, the jury's finding of not guilty on the larceny charges notwithstanding.

We also conclude that the jury's verdict was not inconsistent as a matter of law. "The issue of legal inconsistency typically arises when a defendant is convicted of two offenses that contain contradictory elements.[13] Such verdicts are legally inconsistent if 'the existence of the essential elements for one offense negates the existence of the essential elements for another offense of which the defendant also stands convicted.' *State* v. *Hinton*, 227 Conn. 301, 313, 630 A.2d 593 (1993). . . . [T]he defendant was convicted of one offense and acquitted of the other. [Because the court is] not dealing with a situation in which the defendant is convicted of two offenses, and one conviction negates the other, the verdicts are not legally inconsistent in the usual sense. . . .

"[W]here the inconsistent verdicts claim involves a simultaneous conviction and acquittal on different offenses, the court, in testing the verdict of guilty for inconsistency as a matter of law, is 'necessarily limited to an examination of the offense charged in the information and the verdict rendered thereon without regard to what evidence the jury had for consideration.' *State* v. *Manning*, [supra, 162 Conn. 123], quoting *State* v. *Keating*, 151 Conn. 592, 596, 200 A.2d 724 (1964), cert. denied sub nom. *Joseph* v. *Connecticut*, 379 U.S. 963, 85 S. Ct. 654, 13 L. Ed. 2d 557 (1965). If the offenses charged contain different elements, then a conviction of one offense is not inconsistent on its face with an acquittal of the other. See *State* v. *Manning*, supra,

---

[13] "Claims of legal inconsistency also arise when verdicts are based on a legal impossibility. An example of this would be the conviction of one defendant and the acquittal of the other in a joint trial of two alleged coconspirators. See *State* v. *Robinson*, 213 Conn. 243, 252–53, 567 A.2d 1173 (1989)." *State* v. *Milner*, 46 Conn. App. 118, 122 n.2, 699 A.2d 1022 (1997).

123–24." *State* v. *Milner*, 46 Conn. App. 118, 122–23, 699 A.2d 1022 (1997).

A defendant may be found guilty of forgery in the second degree, in violation of § 53a-139,[14] if the state establishes that the defendant, with intent to deceive another, falsely made, possessed or altered a written instrument that he or she knew to be forged.[15] For a defendant to be found guilty of larceny in the third degree under § 53a-123 (a) (4), the state must prove that the defendant committed larceny by defrauding a public community. See footnote 2 of this opinion. Section 53a-139 contains no requirement that the defendant commit larceny; conversely, § 53a-123 (a) (4) contains no requirement that the defendant commit forgery. Thus, each offense contains different elements and, consequently, "a conviction of one . . . is not inconsistent on its face with an acquittal on the other." *State* v. *Manning*, supra, 162 Conn. 124. Accordingly, the defendant's claim is without merit.

### III

The defendant next claims that the trial court improperly failed to grant her motion for a mistrial or, at a minimum, her request for a curative instruction, after the prosecutor allegedly made certain improper comments during closing arguments. We are not persuaded by this claim.

---

[14] As we previously have indicated; see footnote 1 of this opinion; the defendant was convicted of eight counts of forgery in the second degree under § 53a-139 (a) (2), and one count of forgery in the second degree under § 53a-139 (a) (3).

[15] Subdivision (2) of § 53a-139 (a) contains the additional requirement that the forged document is, purports to be or is calculated to become or represent if completed "a public record or an instrument filed or required or authorized by law to be filed in or with a public office or public servant . . . ." Subdivision (3) of § 53a-139 (a) contains the additional requirement that the forged document is or purports to be or is calculated to become or represent if completed "a written instrument officially issued or created by a public office, public servant or governmental instrumentality . . . ."

The following additional facts are relevant to our resolution of this issue. During his initial closing argument, the prosecutor asserted that the defendant "had this nice, little plan going for her." The prosecutor indicated that, under this alleged scheme, the defendant, upon receipt of a cash payment for a permit, would appropriate the cash to her own use and, for bookkeeping purposes, substitute an undeposited check from a prior reporting period. Following the prosecutor's argument, the defendant moved for a mistrial, claiming that the prosecutor's comments suggested that the defendant had been engaged in a "large pattern of theft" that had not been alleged in the information.[16] The prosecutor responded that, during argument, he had expressly identified the three larcenies with which the defendant had been charged, and that his reference to other evidence adduced during the trial was proper because that evidence was probative of the defendant's larcenous intent. The trial court denied the defendant's motion for a mistrial.

Defense counsel, during closing arguments, attacked the prosecutor's claim that the defendant had stolen cash permit fees and also challenged the prosecutor's claim that the defendant had substituted undeposited checks for cash in an attempt to cover up the theft of such fees. Specifically, defense counsel maintained that the state had failed to demonstrate that the defendant would have been able to "build up an inventory of extra checks" in furtherance of the alleged thefts. Defense counsel also stated that the "case is really all about" the defendant's alleged misappropriation of the total sum of $142, that any failure of the defendant to account for that sum was the result of negligence and overwork and that the state had failed to demonstrate any criminal plan or scheme.

---

[16] The state had sought to establish three separate larcenies of $82, $30 and $30, for a total of $142. See footnote 8 of this opinion.

During his rebuttal argument, the prosecutor sought to explain how the defendant could have accumulated undeposited checks. In so doing, the prosecutor indicated that the jury could infer from the evidence that the defendant had altered certain records regarding the payment of permit fees from contractors in order to make it appear that those fees had not been fully paid. The prosecutor further suggested that, under this scheme, the defendant had charged subcontractors permit fees that already had been paid by general contractors, presumably for the purpose of generating additional cash payments.

Defense counsel objected to this argument and moved for a mistrial or, alternatively, a curative instruction, claiming that the prosecutor improperly suggested that the defendant had engaged in uncharged misconduct, namely, that she had defrauded various subcontractors by charging them permit fees that already had been paid by general contractors. The prosecutor responded that he "was not accusing [the defendant] of additional crimes," but, rather, was attempting to "us[e] the evidence that is in this case to show the jury how they may, if they choose, draw an inference and explain . . . [how the defendant obtained] her supply of checks." The trial court acknowledged that the prosecutor's argument had come "very, very close to making accusations that [the defendant] ripped off subcontractors by the carload" and observed that "there's no evidence of that." Nevertheless, the trial court concluded that the prosecutor's argument did not "go over the line," and denied the defendant's motion for a mistrial. The trial court then asked defense counsel precisely what kind of curative instruction he was seeking, to which counsel replied that he wanted the jury to be "reminded at this point that [its] verdict is not to be based on speculation of any kind . . . ."[17] The court

[17] The prosecutor indicated that he had no objection to the requested instruction.

agreed to give the requested instruction at the conclusion of the case, but declined to do so at that time.

The prosecutor then continued his rebuttal argument. In emphasizing that $142 was not an insignificant amount of money, the prosecutor stated as follows: "[The defendant] knew from her years of experience exactly how this system worked. . . . She was able to take advantage of that system. I'm not saying to you, hold her [accountable] for all the dollars that should have come into the town in cash all these years. I'm not saying to you, do that. I'm saying, when you consider that, consider that as part of her intention to take, withhold and deprive the town of its property. But do not look upon that $142 as being insignificant because it's not insignificant."

At the conclusion of the prosecutor's rebuttal argument, the court recessed for lunch. After the recess, and prior to the jury charge, defense counsel again moved for a mistrial, claiming, inter alia, that the prosecutor's statement that he was not asking the jury to find the defendant accountable "for all the dollars that should have come into the town in cash all these years" improperly implied that the defendant had been engaged in uncharged thefts that had occurred over the years. The prosecutor stated that his comment was in response to defense counsel's attempt to "belittle" the amount of money the defendant allegedly had stolen. The prosecutor further stated that he had specifically noted during his rebuttal argument that the evidence regarding the decreasing amounts of cash was relevant only as to the issue of the defendant's intent. The trial court then denied the defendant's second motion for a mistrial.

In its charge to the jury, the court instructed that "[y]ou may not go outside the evidence to find the facts. This means that you may not resort to guesswork,

conjecture or suspicion . . . ." The court also instructed that "[c]ertain things are not evidence, and you may not consider them in deciding what the facts are. These include arguments and statements by lawyers. The lawyers are not witnesses. What they have said in their closing arguments is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls." The court thereafter reminded the jury that its verdict could not be based upon speculation.

We agree with the trial court that the challenged portion of the prosecutor's closing arguments came close to the line of impropriety because those comments could have been construed as suggesting a broader, more pervasive criminal scheme than that alleged in the information. Nevertheless, we are not persuaded that the trial court was required to grant the defendant's motions for a mistrial or for a curative instruction.

"[I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Andrews*, 248 Conn. 1, 19, 726 A.2d 104 (1999). Thus, as the state's advocate, a prosecutor may "argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." *State* v. *Bova*, 240 Conn. 210, 243, 690 A.2d 1370 (1997). Although the prosecutor's argument regarding the missing cash could have been stated in terms less susceptible to misinterpretation, the jury reasonably could have inferred from the evidence that the defendant's alleged larcenies and forgeries, when taken together, constituted a scheme pursuant to which the

defendant knowingly and intentionally misappropriated cash generated from payments for permits. The prosecutor's argument to that effect was appropriate because the defendant denied that the missing cash was stolen and argued, instead, that the missing cash was not accounted for properly because of disorganization and understaffing. Consequently, the defendant was not entitled to a mistrial as a result of the prosecutor's comments.

Furthermore, although the trial court declined to give the cautionary instruction that the defendant had requested immediately after the challenged comments, the court did give the requested instruction shortly thereafter, during its charge to the jury. In view of the nature of the prosecutor's comments, and its relevance to the defendant's claim that the cash had been misplaced because of sloppiness, and in light of the close temporal proximity of the defendant's request for a cautionary instruction and the inclusion of that instruction in the court's final jury charge, we are not persuaded that, even if the requested cautionary instruction should have been given, the failure of the trial court to give it immediately was harmful to the defendant.[18] Accordingly, we reject the defendant's claim of prosecutorial misconduct.

IV

The defendant finally claims that the trial court violated her rights under the compulsory process and confrontation clauses of the sixth amendment to the United States constitution by quashing a portion of a subpoena duces tecum (subpoena) that she had served on Smith, her immediate supervisor. The defendant further claims

[18] Moreover, the fact that the jury acquitted the defendant of the larceny charges belies the defendant's claim that the challenged argument, which focused on the defendant's alleged misappropriation of funds from contractors, was prejudicial to the defendant.

that this error was harmful and, consequently, that she is entitled to a new trial. For the reasons that follow, we conclude that the case must be remanded to the trial court for a hearing relative to this contention.

The following additional facts are necessary to our determination of the defendant's claim. On January 28, 1997, the second day of trial, the defendant served a subpoena on Smith that directed him to appear in court on that same day and to bring with him certain records and documents. Specifically, the subpoena directed Smith to produce the following three categories of materials:

"A. Any and all operator['s] manuals, procedure guidelines, memorand[a], or written instruments regarding building permit procedure in the . . . [d]epartment from 1993 to 1995.

"B. All computer records of the . . . [d]epartment from the later of Building Permit [No.] 52260 or June 30, 1993 until the present date.

"C. Any correspondence, statements, and/or memoranda to and/or from [the defendant] in possession of the . . . [d]epartment."

The state filed a motion to quash the subpoena. In response, the defendant first maintained that the state did not have standing to challenge the subpoena because the state did not represent Smith. The trial court rejected the defendant's standing argument.

The defendant further claimed that she had a sixth amendment right to obtain the materials identified in the subpoena. With respect to part A of the subpoena, the state indicated that it had no objection to the defendant's request for the documents sought thereunder. The trial judge stated, however: "I do. [The defendant] is charged with the crimes of [larceny in the second degree and forgery in the second degree]. She is not

charged with using a computer improperly or the records didn't jive up right. I think [part] A is irrelevant and immaterial." The court later stated: "[The defendant] is charged with a very simple charge. She's charged with taking money and falsifying documents. I see no reason to have this court listen to or have the jury have to read operator's manuals [or] procedure guidelines . . . . I'm going to . . . deny [part] A . . . ."

The state also indicated that it was pursuing its motion to quash with respect to part B of the subpoena.[19] Although the state did not advance any specific reason for its objection to part B, the trial court granted the state's motion as to part B, concluding that the materials sought thereunder were "irrelevant and immaterial."

On appeal, the defendant renews the standing claim that she had raised at trial. The defendant further contends that, even if the state had standing to challenge the subpoena, the trial court's order quashing parts A and B of the subpoena violated her constitutionally protected rights to compulsory process and to confront the state's witnesses. We agree with the trial court that the state had standing to challenge the subpoena. We conclude, however, that the court improperly quashed part A of the subpoena. Because, however, the record is inadequate for a determination of whether the court's order quashing part A of the subpoena violated the defendant's sixth amendment rights and, if so, whether the violation was harmful, we remand the case to the trial court for a hearing on those issues. With respect to part B of the subpoena, the defendant has failed to explain adequately why the trial court's order quashing that part of the subpoena was improper and, if so,

---

[19] The state originally had objected to part C of the subpoena on the ground that the request was overbroad. The parties, however, subsequently reached an agreement as to part C of the subpoena. Accordingly, part C is not a subject of this appeal.

why that impropriety was of constitutional dimension. Accordingly, we conclude that the defendant has waived her constitutional claim with respect to the trial court's decision to quash part B of the subpoena.[20] See, e.g., *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 246 Conn. 18, 32 n.17, 716 A.2d 78 (1998).

A

The defendant first argues that the state lacked standing to seek to quash the subpoena served on Smith. We reject this claim.

"This court has had many opportunities to determine what constitutes standing. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Internal quotation marks omitted.) *Gay & Lesbian Law Students Assn.* v. *Board of Trustees*, 236 Conn. 453, 466, 673 A.2d 484 (1996). "When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . ." (Internal quotation marks omitted.) *Malerba* v. *Cessna Aircraft Co.*, 210 Conn. 189, 192, 554 A.2d 287 (1989). "Standing requires no more than a colorable claim of injury; a [party] ordi-

---

[20] In the defendant's initial brief filed with this court, she asserted, in conclusory fashion, that the trial court's order quashing part B of the subpoena violated her rights under the sixth amendment. Because the defendant's claim regarding part B of the subpoena was unaccompanied by any analysis or explanation, the state, in its brief, asserted that the defendant had waived her claim of impropriety with regard to that part of the subpoena. The defendant also failed to address the issue in her reply brief. In the absence of any argument by the defendant seeking to explain why the trial court's order quashing part B was improper, constitutionally or otherwise, we deem that claim to have been waived.

narily establishes . . . standing by *allegations* of injury. Similarly, standing exists to attempt to vindicate arguably protected interests." (Emphasis in original; internal quotation marks omitted.) *Gay & Lesbian Law Students Assn.* v. *Board of Trustees*, supra, 466.

We conclude that the state had standing to move to quash the defendant's subpoena. "A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests." *United States* v. *Raineri*, 670 F.2d 702, 712 (7th Cir.), cert. denied, 459 U.S. 1035, 103 S. Ct. 446, 74 L. Ed. 2d 601 (1982). It is inarguable that the state had a legitimate interest in challenging the subpoena duces tecum that had been issued to Smith. The subpoena, which was served by the defendant on a key state witness during the pendency of the trial, sought numerous documents and materials. "The prosecution's standing rested upon its interest in preventing undue lengthening of the trial [and] undue harassment of its witness . . . ." *Id.*

The defendant claims that the town of Westport has its own legal department and could have filed a motion to quash the subpoena on Smith's behalf. This argument, however, misses the point: the interest that the state legitimately sought to protect in seeking to quash the subpoena belonged to the state, not the town. Moreover, many state's witnesses are persons who cannot be expected to hire lawyers and incur the expense associated with challenging a subpoena issued by an accused. Thus, the trial court properly concluded that the state had standing to challenge the subpoena that the defendant served on Smith.

## B

The defendant next contends that the trial court's decision to quash part A of the subpoena duces tecum deprived her of her rights under the confrontation and

compulsory process clauses of the sixth amendment.[21] Specifically, the defendant claims that the trial court improperly quashed part A of the subpoena because the materials sought thereunder, namely, "[a]ny and all operator['s] manuals, procedure guidelines, memorandum[a], or written instruments regarding building permit procedure in the . . . [d]epartment from 1993 to 1995," were central to her defense and likely would have assisted her in cross-examining the state's witnesses. The defendant emphasizes the fact that the forgery charges related directly to her preparation of permits and reports that did not correspond to the payments for the permits. The defendant maintains, as she did at trial, that the claimed forgeries were not motivated by any intent to defraud, deceive or injure the town, but, rather, were the result of overwork, disorganization and an honest attempt to reconcile the permits with the checks. According to the defendant, therefore, information as to any written policies covering the practices of the department with respect to permits and accounting was essential to enable her to mount an effective defense and to refute the state's claims. The defendant asserts, for example, that she could have used the information requested under part A of the subpoena to substantiate a claim that her conduct was not inconsistent with any formal department policy, whether or not any such policy existed.

The state counters that the trial court properly exercised its discretion in quashing part A of the subpoena because it would have been unduly burdensome for

---

[21] The defendant also claims a violation of her rights under article first, § 8, of the Connecticut constitution. Because she provides no independent analysis of her state constitutional claim, however, we limit our review of this issue to her federal constitutional claim. See, e.g., *State* v. *Carter*, 228 Conn. 412, 417 n.6, 636 A.2d 821 (1994).

Smith to have complied with it.[22] The state also characterizes the defendant's request for manuals of the department's policies and procedures as vague, and argues that the request was little more than a "fishing expedition." Finally, the state asserts that the defendant has established no foundation for her contention that the materials sought under part A would have been useful to her defense because she has not demonstrated that the department was subject to any written policies or procedures.[23]

"The sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Carter*, 228 Conn. 412, 422, 636 A.2d 821 (1994). "Although we recognize that the right of a defendant to present a defense is subject to appropriate supervision by the trial court in accordance with established rules of procedure and evidence . . . we are also mindful that the fair opportunity to establish a defense is a fundamental element of due process . . . and that our rules should not be applied mechanistically so as to restrict unreasonably that important right." (Citations omitted; internal quotation marks omitted.) Id., 426–27.

Furthermore, "[t]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses

[22] Of course, the state does not dispute that "[a] subpoena is an appropriate process for the production of documents that are relevant to the matter before the court." *Three S Development Co.* v. *Santore*, 193 Conn. 174, 179, 474 A.2d 795 (1984).

[23] Smith testified that he was unaware of any written policies or procedures.

against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Thus, [t]he confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Andrews*, supra, 248 Conn. 11.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence *tend* to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Emphasis in original; internal quotation marks omitted.) *State* v. *Coleman*, 241 Conn. 784, 788–89, 699 A.2d 91 (1997).

Nevertheless, "[t]he trial court has wide discretion to determine the relevance of evidence . . . . Every reasonable presumption should be made in favor of the

correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Sullivan*, 244 Conn. 640, 653, 712 A.2d 919 (1998). However, "[w]hen defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense." (Internal quotation marks omitted.) *State* v. *Bova*, supra, 240 Conn. 236. Similarly, the exclusion of evidence that provides the defendant a basis for cross-examination of the state's witnesses may give rise to a claim of denial of the defendant's right to confrontation.

We can discern no rational basis for concluding that the materials sought under part A of the subpoena were unrelated to the issues raised at trial. For the reasons articulated by the defendant, those materials were highly relevant to her claim that her conduct was not violative of any official department policy, let alone criminal. Moreover, contrary to the state's belated claim on appeal, the request was "sufficiently particularized . . . that the documents sought [were] readily identified." *Three S Development Co.* v. *Santore*, 193 Conn. 174, 179, 474 A.2d 795 (1984). There is nothing vague or unclear about part A of the subpoena; it seeks written materials setting forth the department's policies and procedures regarding the processing of building permits. Finally, no persuasive argument has been made that a search for these materials would have been unduly burdensome or time consuming. Indeed, the prosecutor, by indicating that he had no objection to part A of the subpoena, likely recognized that the defendant had a right to obtain the materials identified therein.

Nevertheless, on the present record, we cannot determine whether the trial court's decision to quash part A of the subpoena violated the defendant's constitutionally protected rights under the compulsory process or confrontation clauses. Because the trial court prohib-

ited the defendant from obtaining the materials sought under part A of the subpoena, we do not know whether any such materials exist. If such written policies and procedures do exist, we do not know the extent to which they may support the defendant's claim that her conduct, though sloppy or negligent, was not criminal. Moreover, we do not know whether the defendant followed some or all of the policies, or none at all. In the absence of such facts, we cannot determine the harm, if any, suffered by the defendant as a result of the failure to produce those written policies and procedures. On the other hand, if the department maintained no such written guidelines, then the defendant still must demonstrate that the trial court's decision to quash part A of the subpoena so inhibited her ability to establish that fact, notwithstanding other evidence of the absence of any written policies or procedures; see footnote 23 of this opinion; that she is entitled to a new trial.

Under the circumstances, therefore, we are persuaded that an initial determination of the foregoing issues should be made by the trial court, which will have the opportunity to do so on the basis of a full factual record developed after a hearing. Thereafter, the parties will be able to present to this court whatever arguments may be appropriate regarding whether the defendant's sixth amendment rights were violated and whether she suffered harm as a result of the trial court's decision to quash part A of the subpoena issued to Smith.

The case is remanded to the trial court for further proceedings in accordance with this opinion. We retain jurisdiction over this appeal for purposes of any further appellate proceedings.

In this opinion BORDEN, NORCOTT and KATZ, Js., concurred.

MCDONALD, J., concurring in part and dissenting in part. I agree with parts I, II and III of the majority opinion.

I also agree with part IV that the trial court should not have quashed the subpoena duces tecum that Rita DeCaro, the defendant, issued. I believe, however, that the record is sufficient for us to determine that the defendant was prejudiced by the improper quashing of the subpoena.

Ultimately, I believe the jury should have been given the opportunity to assess the credibility of any response to the subpoena seeking not whether witnesses for the town knew of such written policies or procedures; see footnote 23 of the majority opinion; but whether, in fact, any such written policies or procedures had existed or did exist. If the subpoenaed documents exist, they are, as the majority recognizes, "highly relevant," and the defendant was therefore entitled to cross-examine the state's witnesses concerning them. Whether in fact such documents exist was also an issue to be decided by the jury, assessing the credibility of any witness testifying before it on that issue. In either case, the quashing of the subpoena was harmful. This is at the heart of a jury trial. "[T]he trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) *State* v. *Provost*, 251 Conn. 252, 256, 741 A.2d 295 (1999); see also *State* v. *Aponte*, 249 Conn. 735, 756, 738 A.2d 117 (1999) (credibility of witnesses is within exclusive purview of jury); *State* v. *Porter*, 241 Conn. 57, 120, 698 A.2d 739 (1997), cert. denied 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998) ("forming impressions and intuitions regarding witnesses is the quintessential jury function"); *State* v. *Hines*, 187 Conn. 199, 210, 445 A.2d 314

(1982) (litigant has constitutional right to have issue of fact decided by jury and not by court). Because it is not for a court, in lieu of the jury, to determine the effect of any response to the subpoena, I would order a new trial.