STATE OF CONNECTICUT *v.* CLIFF BROWN
(SC 16946)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued February 7—officially released April 12, 2005

*Richard E. Condon, Jr.,* assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *John C. Smriga,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Cliff Brown, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a. On appeal,[1] the defendant claims that the trial court improperly: (1) precluded him from cross-examining the arresting officer about the officer's use of deadly force on a prior occasion, and his knowledge of the police department's deadly force policy; and (2) concluded, following an in camera review, that the officer's personnel file did not contain information clearly material and relevant to the issues in the case. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On December 15, 2000, the defendant had been visiting with friends at the home of Pablo Pagan, located in Bridgeport on Central Avenue near its intersection with Boston Avenue, from the afternoon into the eve-

---

[1] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b) (3), because murder is a class A felony for which the maximum sentence that may be imposed exceeds twenty years. See General Statutes §§ 53a-54a (c) and 53a-35a (2).

ning before he was to report to work at United Parcel Service for a shift starting at 11 p.m. During this visit, the defendant had been drinking alcoholic beverages and had taken a "couple of pulls" of marijuana. He was wearing old work clothes consisting of black jeans, a black hooded sweatshirt, a black leather jacket and black boots. The defendant then left Pagan's home to purchase a cigarette at a nearby convenience store, and subsequently met Aaron Kearney, who had been friendly with the defendant for more than ten years.[2] Kearney was sitting in his white minivan, which was parked on Central Avenue facing away from Boston Avenue; he and the defendant sat and drank cognac for approximately twenty minutes. Prior to leaving the van, the defendant showed Kearney his weapon, a small .38 caliber handgun.[3]

Approximately ten minutes later, at 7:30 p.m., the victim, Evon Brown, was stopped at a traffic light at the intersection of Boston Avenue and Central Avenue while driving his black Toyota Corolla. Kearney then heard gunshots. Before the gunshots ended, he saw a police car pull up and stop before the end of the gunshots, and he saw a police officer chase the defendant into a driveway.[4] That police officer was Officer John Roach of the Bridgeport police department, who had

[2] We note that the credibility of Kearney, a key witness for the state, was at issue at the trial because of conflicting statements that he had given to the police and the defendant's investigator, including his admission that he initially had not been truthful about what he had witnessed. Kearney also made his statements implicating the defendant while he was detained by the police on other charges unrelated to this case. Moreover, he is a convicted, incarcerated felon with six other felony charges pending against him.

[3] We note that the defendant denied ever owning a handgun. The police did, however, recover a bullet from his pocket when he was taken to the hospital. The defendant stated that he had found the bullet, which we note was not of the same caliber that the victim was shot with.

[4] Kearney testified that his view of the chase in the middle of the street was through his van's side-view mirror, and that Roach and the defendant ran across his view when they entered the driveway.

been on patrol in the area in his marked patrol car. Roach had been driving westbound on Boston Avenue when he heard several gunshots fired as he passed the intersection with Palisade Avenue. Roach then saw the victim running eastbound on the Boston Avenue sidewalk toward Central Avenue with his hands up, being chased by the defendant who was shooting at him. Roach drove his vehicle at the defendant, who nevertheless continued to fire his weapon at the victim, who ultimately collapsed in front of a convenience store. Roach then stopped his car on Boston Avenue near Central Avenue, and pursued the defendant on foot down Central Avenue. He testified that the defendant looked at him before firing at the victim again.[5] While on Central Avenue, the defendant fired one shot at Roach. Roach returned fire at that time with his nine millimeter Beretta semiautomatic handgun.

Roach continued to chase the defendant down Central Avenue. He followed the defendant into a driveway that separated two houses on Central Avenue, and proceeded up the driveway toward Bell Street, which runs parallel to Central Avenue. As the chase continued, the defendant turned and Roach fired several shots at him again. The defendant then continued to run toward Bell Street, and went over a fence onto Bell Street. Roach then ran back to his car on Central Avenue, and called for additional assistance and an ambulance for the victim, who was located in front of the convenience store on Boston Avenue.

After Roach called for help, he ran to Bell Street via Boston Avenue.[6] A woman then screamed that the

---

[5] Roach testified on cross-examination that he could see part of the defendant's face when the defendant turned toward him during the chase, because the rest of his head initially was obscured by the hood that he was wearing. Roach also testified, however, that the hood began to fall off during the chase, and was entirely off by the time he found the defendant on the back porch.

[6] Roach testified on cross-examination that he was fixated on the chase, and did not notice other details about the scene, such as the victim's car,

defendant was in her backyard. Shortly thereafter, Roach and several other police officers went to that yard and found the defendant on the woman's porch lying in a pool of blood from a leg wound.[7] A subsequent police search located an empty Grendel .38 caliber handgun in that yard. Thereafter, the officers followed the path taken by Roach during the chase and found numerous .38 caliber shell casings both thereon and at the intersection.

During trial, the state argued that the defendant's motive for the shooting was his desire to get revenge against William "Rakim" Newkirk. According to Newkirk, he and the defendant previously had been "associates" as they were "sort of" friends who used to hang out together frequently on Central Avenue. They ceased to be friends or "associates" in 1997, because of rumors that the defendant thought Newkirk had shot him, and that the defendant desired revenge against Newkirk. Although their friendship had ended, the defendant knew that, in December, 2000, Newkirk drove a black 1997 Toyota Corolla.[8] At trial, the defendant denied any involvement in the shooting of the victim, arguing that the state had mistaken him for someone else; he was simply in the wrong place at the wrong time.[9]

---

until he went back to his own patrol car to call for help. He did, however, emphasize that he had not observed anyone besides the defendant committing a crime.

[7] Roach testified on cross-examination that, until he found the defendant on the porch, he was not sure if he had hit the defendant while firing his weapon.

[8] The Toyota was registered to Newkirk's wife, and he drove it frequently. Newkirk was driving the car on the night of the shooting, and his wife, Crystal, had, in fact, been told by a friend that it was he who had been shot. After friends brought her to the scene, she did not think the car was hers, but nevertheless went to the hospital to be sure. Thereafter, her friend returned to the scene to confirm that the car was not hers. Crystal subsequently confirmed at the hospital that the victim was not her husband.

[9] The defendant testified that he did not shoot the victim, and did not shoot at Roach. The defendant testified that after purchasing a loose cigarette at the convenience store, he exited the store and proceeded south on Central Avenue to return to Pagan's house. He testified that he observed the black

With respect to the crime scene and any scientific evidence, Malka Shah, an associate medical examiner, testified that the victim received a total of four gunshot wounds to his upper left leg, left ankle, right buttock, and the left side of his upper back passing into his heart, lungs and major vessels. According to Marshall Robinson, the state's firearms expert, the four bullets that were recovered from the victim's body were fired from the gun found in the yard. Sergeant William Mayer testified, however, that the entire gun, including the trigger, tested negative for fingerprints. He noted that the surfaces of the gun handle and slide were "parkerized," or rough and ridged, which makes it difficult for fingerprints to adhere.

Shortly thereafter, the defendant was charged with the murder of the victim in violation of § 53a-54a (a), and the attempted murder of Roach in violation of General Statutes §§ 53a-54a (a) and 53a-49 (a). In December, 2002, a jury trial was held and the jury returned a verdict finding him guilty of murder, but not guilty of attempted

car pull up to the intersection at the light. He also saw two men exit a white van parked nearby and walk north on Central Avenue toward the car at the light. The defendant then stated that he heard gunshots before seeing the passenger door of the car open and an individual run around the corner as a number of other people in the area scattered. The defendant then ran away from the scene before cutting into the driveway leading toward the backyard. He then looked over his shoulder and saw another person, dressed in all black, run into the yard. Continuing to hear gunshots, the defendant continued to run before he jumped the fence into the backyard and to Bell Street. The defendant then realized that he had been shot in the leg. At that point, the police came to him, checked him for weapons, had him taken to the hospital, and secured bags around his hands.

The defendant also testified that he is left-handed from birth, with a weak right hand from a work injury, and another witness, Mousa Mohammad, saw the shooter use his right hand. Mohammad, a local shopkeeper, witnessed the shooter chase the victim, who collapsed in front of his store. He also witnessed the subsequent police chase. He testified that he was familiar with the defendant because he was from the area, but that he could not identify whether the shooter was the defendant.

murder.[10] The trial court, *Owens, J.*, rendered a judgment of conviction in accordance with the verdict, and sentenced the defendant to a total effective sentence of fifty years imprisonment. This appeal followed.

I

WHETHER THE TRIAL COURT IMPROPERLY PRECLUDED THE DEFENDANT FROM CROSS-EXAMINING ROACH ABOUT HIS USE OF DEADLY FORCE ON A PRIOR OCCASION AND HIS KNOWLEDGE OF THE POLICE DEPARTMENT'S DEADLY FORCE POLICIES

The defendant first claims that the trial court denied him his sixth amendment right to confront witnesses by prohibiting him from cross-examining Roach about: (1) his training and department policies with respect to officer and civilian safety during the use of deadly force; and (2) his prior use of deadly force under "questionable circumstances . . . ." The defendant also contends alternatively that, this ruling, if not rising to the level of a constitutional violation, nevertheless was an abuse of the trial court's discretion with respect to the admission of evidence. The state argues in response that: (1) the trial court's ruling is subject to review only for evidentiary error because the defendant received the constitutionally required minimum opportunity to cross-examine those witnesses testifying against him; and (2) the trial court did not abuse its discretion by concluding that the defendant's proposed line of questioning was irrelevant.

---

[10] This was the second trial of this matter. The defendant was first tried before a jury in January, 2002, and the trial court, *Hauser, J.*, declared a mistrial because that jury could not reach a verdict.

We begin by noting the scope of the rulings under review. During cross-examination, the defendant questioned Roach about his police academy training with respect to observation skills. The state objected to this line of questioning. At sidebar, the trial court then inquired about whether the defendant also desired to cross-examine Roach about the police department standards governing the use of a firearm with respect to a fleeing suspect. The court and counsel then engaged in an extensive colloquy wherein the defendant explained that Roach had been involved in a prior shooting incident that led to a federal civil rights action, which has since resulted in a published decision, *Thomas* v. *Roach*, 165 F.3d 137 (2d Cir. 1999). The defendant explained that, while the outcome and result of that prior action was not significant, he wanted to use its existence to: (1) demonstrate Roach's knowledge of the proper use of deadly force; and (2) to impeach Roach's credibility by showing that the propriety of his shooting the defendant directly hinged on the accuracy of his observation of the defendant, essentially, "he has to say that's the guy he saw." In response, the state argued that the inquiry into the propriety of the shooting with respect to departmental standards governing the use of deadly force was both an inappropriate collateral inquiry and inflammatory.

The trial court ruled that the defendant could cross-examine Roach about his department training in observation, as well as his specific observations with respect to this case, but that the defendant was precluded from "go[ing] into the area of whether or not he had prior offenses or prior similar conduct during the course of prior similar or dissimilar actions, or activities." The trial court also precluded the defendant from questioning Roach about safety training with respect to officers or civilians. The defendant then took an exception

to the trial court's ruling, and proceeded with the remainder of the cross-examination.[11]

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him." (Internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 678, 735 A.2d 267 (1999). "The primary interest secured by confrontation is the right to cross-examination . . . . As an appropriate and potentially vital function of cross-examination, exposure of a witness' motive, interest, bias or prejudice may not be unduly restricted. . . . Compliance with the constitutionally guaranteed right to cross-examination requires that the defendant be allowed to present the jury with facts from which it could appropriately draw inferences relating to the witness' reliability. . . . [P]reclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . Further, the exclusion of defense evidence may deprive the defendant of his constitutional right to present a defense." (Citations omitted; internal quotation marks omitted.) *State* v. *DeJesus*, 270 Conn. 826, 835, 856 A.2d 345 (2004).

"However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Thus, [t]he confrontation clause does not . . . suspend

[11] During the remainder of his cross-examination, the defendant questioned Roach about his location at the time when he made his observations. Specifically, the defendant asked Roach about the location of his car prior to the start of the chase, and whether his vision was obscured by the headlights of other cars in the area. The defendant also questioned Roach about the chase, including whether he knew his shots had hit his intended target, and about distinctions with respect to his observation of a car in the driveway that he had mentioned during the defendant's first trial, and other inconsistencies with respect to when the defendant's hood fell off.

the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable. . . . [Furthermore, the] trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . [Finally, the] proffering party bears the burden of establishing the relevance of the offered testimony."[12] (Internal quotation marks omitted.) *State* v. *King,* supra, 249 Conn. 678; accord *State* v. *Colon,* 272 Conn. 106, 198–99, 864 A.2d 666 (2004) ("our law is clear that a defendant may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated" [internal quotation marks omitted]).

Although "[t]he general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . The constitutional standard is met when

---

[12] "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not [unfairly] prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Sandoval,* 263 Conn. 524, 542–43, 821 A.2d 247 (2003).

defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony. . . . The defendant's right to cross-examine a witness, however, is not absolute. . . . Therefore, a claim that the trial court unduly restricted cross-examination generally involves a two-pronged analysis: whether the aforementioned constitutional standard has been met, and, if so, whether the court nonetheless abused its discretion . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Francis*, 267 Conn. 162, 181, 836 A.2d 1191 (2003).

Accordingly, we first must determine whether the defendant's cross-examination of Roach met the minimum constitutional standards required by the sixth amendment. The defendant's constitutional right to cross-examination is satisfied "[w]hen defense counsel is permitted to expose to the jury the facts from which it appropriately can draw inferences relating to the reliability of the witness . . . ." *State* v. *Christian*, 267 Conn. 710, 747, 841 A.2d 1158 (2004). "[W]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Clark*, 260 Conn. 813, 828, 801 A.2d 718 (2002). Having reviewed the record, we conclude that the defendant was not deprived of a meaningful opportunity to cross-examine Roach, as he questioned Roach extensively about the chase, his observations, and inconsistencies in his testimony between this trial and the prior

proceeding. See footnote 11 of this opinion. Accordingly, he was "permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) *State* v. *Francis*, supra, 267 Conn. 181, quoting *Davis* v. *Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). We, therefore, now must determine whether the trial court nevertheless abused its discretion by precluding the defendant from questioning Roach about the department standards and the prior shooting incident.

"Section 6-5 of the Connecticut Code of Evidence provides: 'The credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely.' 'The range of matters potentially giving rise to bias, prejudice or interest is virtually endless.' Conn. Code Evid. § 6-5 commentary. 'Because evidence tending to show a witness' bias, prejudice or interest is never collateral . . . impeachment of a witness on these matters may be accomplished through the introduction of extrinsic evidence, in addition to examining the witness directly. . . . The scope and extent of proof through the use of extrinsic evidence is subject to the court's discretion, however . . . and whether extrinsic evidence may be admitted to show bias, prejudice or interest without a foundation is also within the court's discretion. . . .

" 'The offering party must establish the relevancy of impeachment evidence by laying a proper foundation . . . which may be established in one of three ways: (1) by making an offer of proof; (2) the record independently may establish the relevance of the proffered evidence; or (3) stating a good faith belief that there is an adequate factual basis for [the] inquiry.' " *State* v. *Abernathy*, 72 Conn. App. 831, 845, 806 A.2d 1139, cert.

denied, 262 Conn. 924, 814 A.2d 379 (2002). However, otherwise "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, *confusion of the issues,* or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." (Emphasis added.) Conn. Code Evid. § 4-3; see also *State* v. *Ferguson,* 260 Conn. 339, 353, 796 A.2d 1118 (2002) (trial court properly refused to admit blurry photograph, proffered as evidence of third party culpability, because "presentation of the [gas station security camera] photograph to the jury likely would have led to confusion").

We conclude that the trial court did not abuse its discretion by precluding the defendant from questioning Roach about his training and department policies with respect to officer and civilian safety when using deadly force, as well as his prior use of deadly force under "questionable circumstances," as described by the United States Court of Appeals for the Second Circuit in *Thomas* v. *Roach,* supra, 165 F.3d 137. The trial court reasonably could have determined that the introduction of such testimony, as well as a discussion of the standards governing the use of the force, potentially would have confused the issues in the case,[13] and

---

[13] We note that the facts and circumstances surrounding the prior shooting, as described in the recitation of facts by the Second Circuit in *Thomas* v. *Roach,* supra, 165 F.3d 137, render it a particularly confusing and therefore, inappropriate, diversion for the jury in the present case, which already had a complex factual dispute of its own to resolve. The prior shooting arose from the police response to a report of the plaintiff, who was an emotionally disturbed person with a knife who had threatened several residents of an apartment building in Bridgeport. Id., 140–41. After they searched the building for the plaintiff, four officers, including Roach, fired at him numerous times after they encountered him in a stairwell that was lit only by two flashlights, rendering the plaintiff a paraplegic. Id., 141. The plaintiff subsequently pleaded nolo contendere to criminal charges arising from the incident. Id., 144. The Second Circuit concluded that summary judgment was inappropriate because there were numerous issues of material fact, including whether: (1) the plaintiff had a knife; (2) the plaintiff had made a stabbing motion with that knife aimed at Roach prior to the officers firing their

diverted the jury's attention to the collateral issue of the propriety of Roach's conduct in light of departmental standards. Moreover, the irrelevance of the departmental use of force standards is shown by the fact that violation of the standards and correct identification of the perpetrator are *not* mutually exclusive, as are adherence to the letter of the standards and incorrect identification of the perpetrator. We agree with the state's contention that extensive questioning on this point improperly would have turned the trial into "one of Roach's professional conduct throughout his career, and not whether this defendant was responsible for killing [the victim]."

Moreover, the record reveals that the defendant was able to attack Roach's credibility irrespective of the trial court's evidentiary ruling by, inter alia, pointing out Roach's interest in identifying the defendant as the individual who killed the victim.[14] It seems to us axiomatic that a police officer has, as a matter of common sense, and irrespective of any *specifically discussed* departmental policies or legal consequences, an interest in not shooting the wrong person, which the jury properly may consider in weighing the credibility of his testimony. It is well settled that, "[i]n assessing the credibility of a witness, jurors are permitted to rely on their everyday experience. Common sense does not take flight at the courthouse door." *State* v. *Rivera*, 74 Conn. App. 129, 138, 810 A.2d 824 (2002); see also *State* v. *Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985) ("[i]t is an abiding principle of jurisprudence that common

weapons; (3) it was feasible for the officers to warn the plaintiff before firing their weapons; and (4) the officers continued to fire their weapons as the plaintiff already was reeling back. Id., 143–44.

[14] The defendant contends that the prior incident has particular relevance to Roach's credibility because of his familiarity with the repercussions from the use of force, as well as the fact that Roach is "unique" by comparison to other officers because he has used deadly force more than once in his career. We disagree, and conclude that discussion of the prior shooting would only serve to make this line of questioning particularly inflammatory. Indeed, as the state points out, Roach's actions in shooting the defendant

sense does not take flight when one enters a court-room"); *State* v. *Sells*, 82 Conn. App. 332, 343, 844 A.2d 235 ("[e]very appeal to common sense does not need to be supported by an evidentiary underlayment, nor does an invitation to the jury to apply wisdom learned from the ordinary experiences of life to the facts fairly adduced at trial"), cert. denied, 270 Conn. 911, 853 A.2d 529 (2004). Accordingly, we note that the defendant properly and vigorously argued this point during sum-mations, without objection from the state or interrup-tion from the trial court.[15] We, therefore, conclude that the trial court did not abuse its discretion when it pre-cluded the defendant from questioning Roach about: (1) his training and department policies with respect to officer and civilian safety during the use of deadly force; and (2) his prior use of deadly force.[16]

## II

## WHETHER THE TRIAL COURT IMPROPERLY CONCLUDED, FOLLOWING AN IN CAMERA REVIEW, THAT ROACH'S PERSONNEL FILE DID NOT CONTAIN INFORMATION MATERIAL AND RELEVANT TO THE ISSUES IN THE CASE

The defendant next asks us to review Roach's person-nel file to determine if the trial court properly con-

*could have* violated department policy regardless of whether his identifica-tion of the defendant as the shooter was correct.

[15] Specifically, the defendant's counsel argued that "Officer Roach wasn't completely truthful with us. But we—or, I don't completely expect Officer Roach to come in and say; I shot somebody, but I shot the wrong guy. He has a reason for saying what he said." Indeed, while attacking the probative value of the shell casings that the state argued indicated that someone had fired at Roach, the defendant's attorney also argued: "Now Officer Roach, when he talks about it, he doesn't say anything at all except what he needs to say to stay on the right side of this controversy. . . . Of course, at the right time he says the suspect turned toward him and he fired. He says he was either fired upon or thought he was going to be fired upon. That's why he fired. He now justifies the firing of his weapon." Indeed, the state did not object to these arguments, and responded to them in its rebuttal summation.

[16] Accordingly, we need not reach the defendant's contentions that the trial court's preclusion of this testimony was harmful error that requires a new trial under either the constitutional or nonconstitutional standards.

cluded, after an in camera review conducted pursuant to *State* v. *Januszewski*, 182 Conn. 142, 171–73, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), that it does not contain information clearly relevant and material to his credibility. The state echoes this request, and emphasizes that the trial court's determination with respect to the contents of the file is reviewed for abuse of discretion.

The record reveals the following additional relevant facts and procedural history. Prior to trial, the defendant had subpoenaed Roach's personnel file from the Bridgeport police department. The defendant argued that those records were going to be relevant because they likely would contain: (1) any medical or psychological clearance that Roach had received to return to duty following the prior incident; and (2) information about Roach's veracity, as well as a racially motivated common scheme or prejudice demonstrated by the shootings. In response, the state emphasized the confidential nature of the personnel files. It claimed that the prior shooting was an isolated incident that was irrelevant to the present case, and insufficient to show a common scheme of racial bias. The trial court thereafter conducted an in camera review of the file, and concluded that it did not contain any evidence clearly relevant and material to Roach's credibility. Accordingly, the trial court declined to release the file to the defendant.

In *State* v. *Januszewski*, supra, 182 Conn. 170–73, this court concluded that it was improper for a trial court to quash a subpoena issued by the defendant for the personnel records of a state police officer who was to testify against him, without first engaging in an in camera review. The court held that the defendant's request implicated a "more significant" right than the public's right to certain information under the Freedom of Information Act, which is "the right of a criminal defendant to impeach the witnesses who testify against

him." Id., 171. The court noted that the "competing interests here are both weighty and legitimate," and that "[t]here are strong policy reasons for maintaining the confidentiality of personnel files of the type involved in this case." Id., citing General Statutes (Rev. to 1979) § 1-19 (b) (2). The court sought to balance these interests by adopting an approach whereby the trial court, in the exercise of its discretion over the matter of discovery, "must weigh the defendant's need to examine confidential matter for the purpose of discovering impeaching material against the public policy in favor of the confidentiality of private and personal information." *State* v. *Januszewski*, supra, 171–72.

This court further stated that "[t]he disclosure of such information must be carefully tailored to a legitimate and demonstrated need for such information in any given case. Where disclosure of the personnel file would place in the hands of a defendant irrelevant or personal and sensitive information concerning the witness, the entire file should not be disclosed. No criminal defendant has the right to conduct a general 'fishing expedition' into the personnel records of a police officer. Any request for information that does not directly relate to legitimate issues that may arise in the course of the criminal prosecution ought to be denied." Id., 172. Noting that personnel files frequently may contain uncorroborated complaints and "other information which may or may not be true but may be embarrassing, although entirely irrelevant to any issue in the case, even as to credibility," this court directed that the trial court must exercise "careful discrimination between material that relates to the issues involved and that which is irrelevant to those issues," and that "[a]n in camera inspection of the documents involved, therefore, will under most circumstances be necessary." (Internal quotation marks omitted.) Id., 172–73.

Moreover, the court "reemphasize[d] that, in resolving requests for disclosure, routine access to personnel files is not to be had. Requests for information should be specific and should set forth the issue in the case to which the personnel information sought will relate. The trial court should make available to the defendant only information that it concludes is clearly material and relevant to the issue involved. . . . In this regard, the trial court should exercise its discretion in deciding the temporal relevancy or remoteness of material sought. . . . Because the law furnishes no precise or universal test of relevancy, the question must be determined on a case by case basis according to the teachings of reason and judicial experience."[17] (Citations omitted.) Id., 173; see also *State* v. *Betances*, 265 Conn. 493, 508, 828 A.2d 1248 (2003) ("[o]n that record, the trial court reasonably could have concluded that there was an insufficient nexus between the information requested and the defendant's prosecution, and that the defendant merely was seeking to conduct a 'fishing expedition' through [the police officer's] personnel records"). The court then concluded that the trial court's failure to conduct an in camera inspection was improper, but that it was harmless error on the facts of the case. *State* v. *Januszewski*, supra, 182 Conn. 173–75.

We have conducted an in camera review of Roach's personnel file in accordance with the standards articu-

[17] See also *State* v. *Robinson*, 227 Conn. 711, 744, 631 A.2d 288 (1993) (in camera review of correction officers' personnel files for references to riot that led to charges against defendant); *State* v. *Leonard*, 31 Conn. App. 178, 197, 199, 623 A.2d 1052 (trial court did not abuse discretion by refusing defendant access to four police officers' personnel files after concluding three had nothing "relevant to their credibility, or any complaints or actions taken against them regarding the use of excessive force, brutality or racial bias" and the fourth had "something . . . that might remotely bear on his credibility," but "was not exculpatory and did not have sufficient probative value to outweigh the policy of confidentiality"), cert. granted, 226 Conn. 912, 628 A.2d 985 (1993) (appeal withdrawn January 7, 1994).

lated in *Januszewski.* Our inspection of the file did not reveal any document clearly material and relevant to Roach's credibility in the present case. Accordingly, the trial court did not abuse its discretion by declining to disclose the file to the defendant for impeachment purposes.

The judgment is affirmed.

In this opinion the other justices concurred.