STATE OF CONNECTICUT *v.* RITA DECARO
(SC 15891)

Borden, Norcott, Katz, Palmer and McDonald, Js.

Submitted on briefs June 22, 2005—officially released October 31, 2006

*Philip Russell* filed a brief for the appellant (defendant).

*Susan C. Marks*, supervisory assistant state's attorney, filed a brief for the appellee (state).

PALMER, J. In *State* v. *DeCaro*, 252 Conn. 229, 745 A.2d 800 (2000), this court rejected all but one of the claims raised on appeal by the defendant, Rita DeCaro, who had been convicted, after a jury trial, of nine counts of forgery in the second degree in violation of General Statutes § 53a-139 (a).[1] See id., 231–32. With respect to the defendant's remaining claim, namely, that her sixth amendment rights to confront witnesses and to compulsory process[2] were violated on the basis of the trial court's decision to quash a portion of a subpoena duces tecum (subpoena) that she had served on her former supervisor seeking documents relevant to the case, we agreed with the defendant that the trial court's decision to quash that portion of the subpoena was improper. See id., 258. Because, however, we could not determine, on the basis of the trial court record, whether that impropriety had resulted in a violation of the defendant's sixth amendment rights, we remanded the case to the trial court for a hearing on that issue. Id., 259. Following that hearing, the trial court determined that the defendant had received, in a timely manner, the documents that were the subject of the contested portion of the subpoena and, therefore, that the subpoena had been complied with. We agree with the trial court and further conclude that the defendant suffered no deprivation of her sixth amendment rights. Accordingly, we affirm the judgment of conviction.

In *State* v. *DeCaro*, supra, 252 Conn. 229, we set forth the following facts that the jury reasonably could have found. "At all relevant times, the defendant worked

---

[1] The jury found the defendant not guilty of three counts of larceny in the second degree in violation of General Statutes § 53a-123 (a) (4).

[2] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . [and] to have compulsory process for obtaining witnesses in his favor . . . ."

as an account clerk for the . . . building department (department) [of the town of Westport (town)]. The department processes all applications for building permits. While the defendant was employed at the department, her immediate supervisor was the [town] building official, Stephen Smith. Smith, in turn, reported to the fire chief, Richard Gough. Among other tasks, the defendant collected permit fees. She also processed the permit applications on the department's computer and printed out each permit. A computer generated permit would not become valid, however, until it was signed by one of the department . . . officials. Hard copies of all signed permits were kept in manila file folders in the department offices. The defendant also prepared periodic reports . . . accounting for the permits issued and funds collected, by check or cash, over a particular time period, usually once every one or two weeks. These reports were used by the town controller, Donald Miklus, to prepare the fees for deposit. When the defendant went on vacation or was ill, no reports were generated until her return. Smith did not review the reports the defendant had prepared for Miklus.

"The defendant often complained about problems that she was having with the computer program, including inaccuracies in the function used to generate the reports for Miklus. Specifically, she complained that when she created these reports, permits often would be missing from the list. The defendant complained about this problem to Gough, who told her to type in the missing permits. The defendant also complained that she had difficulty retrieving information regarding permits from prior fiscal years.

"In April, 1994, an individual contacted the controller's office about a check that his bank had returned. Although the individual had issued the check to the department in October, 1993, in payment of a permit fee, the check had not been presented for payment to

his bank until April, 1994. While investigating the reason for this delay, the controller's office discovered that a substantial number of checks deposited during certain periods did not correspond to the permits listed on the reports for those periods. According to Smith, the checks should have been deposited during the same period that the permits were issued. The controller's office also found numerous instances in which a permit was listed on a report for a particular period, but the fee for the permit had been covered by a check in the name of someone other than the permit applicant, and the check corresponding to the permit had been deposited in a later period. Miklus informed both Smith and Gough of these irregularities and also expressed his concern that unusually small amounts of cash had been included in recent department deposits. Neither Smith nor Gough previously had been aware of the existence of any undeposited cash or checks, or of any discrepancies between the period in which a particular fee was received and the period in which that fee had been deposited.

"After the close of business on or about May 11, 1994, Gough conducted a search of the department offices. During the course of the search, he found an envelope in the defendant's desk containing a steno pad and approximately eighty-six checks totaling $2593. The checks bore dates ranging from December, 1993, through April, 1994. Gough also found cash in the defendant's desk in two separate locations totaling $82 and $30, respectively.

"During the next reporting period, Miklus and Gough noted that $112 in cash had been received by the defendant in payment for permit fees. Miklus and Gough waited to see if the cash and checks that Gough had discovered in the defendant's desk would be included in the defendant's next report. When the defendant had failed to include the checks or cash in her report, Gough,

Smith and Miklus arranged to meet with the defendant. At that meeting, which occurred on May 20, 1994, the defendant was asked why the checks did not correspond to the permits listed on the report. The defendant said that she was unaware of the discrepancy and attributed any discrepancy to her heavy workload. When asked about the cash and why it was not deposited, the defendant said that she must have used it to make change for someone who had overpaid with a check. The defendant also said that she was unaware of any undeposited checks from earlier reporting periods. She indicated that the only checks remaining in the department offices would be those checks that had been received during the current reporting period. Miklus then suggested that they search the department offices to see whether there were any checks there that should have been deposited during a prior period.

"Gough, Smith and Miklus gave the defendant an opportunity to look for such checks, but she claimed to be unable to find any. Gough then retrieved from the defendant's desk the envelope that he had found earlier, containing the checks and a steno pad. The defendant tried to take the envelope from Gough, but he handed it to Miklus. The defendant was asked why the checks were in the envelope. She stated that they corresponded to permits not yet reflected in her reports. Miklus retained the checks and the pad, then asked the defendant if she could produce the permits corresponding to the checks in the envelope. The defendant agreed to do so, and some time thereafter, provided Gough with thirty-two documents that she claimed to be the corresponding permits. None of the thirty-two documents, however, was signed by a building official.

"Gough and the controller's office reviewed the thirty-two documents, which reflected a total of $3140 in fees, to determine whether they were legitimate and whether they corresponded to the checks found in the

defendant's desk. On September 30, 1994, Gough and Miklus held another meeting with the defendant at which they reported their findings regarding the documents. Although their review indicated that some of the permits were legitimate in that they had not been issued previously, others related to projects for which the general contractor already had prepaid all applicable fees. Specifically, approximately ten of the permits, representing $326 worth of fees, corresponded to work for which permits previously had been issued at no fee as a result of general contractors' prepayments for anticipated subcontractor work. Thus, there was no reason for such permits to have been issued. Moreover, none of the checks found in the defendant's desk matched any of the thirty-two permits.

"When asked for an explanation, the defendant reported that she had not checked the manila file folders in preparing the documents. She indicated that, instead, she only had consulted the computer, and provided permits that, to the best of her knowledge, had not yet been issued. The defendant also was asked why there had been so little cash deposited recently. The defendant responded only that the department received cash in 'dribs and drabs.' Regarding the cash fees that the department had received in May, 1994, the defendant could not explain why that cash had not been deposited.

"In February, 1995, the police questioned the defendant about the various discrepancies and irregularities. Thereafter, the defendant went to Miklus' deputy, John Kondub, to point out that there was cash in the office, in three different locations, that had been received in payment for photocopying department records. She told Kondub that she 'wasn't going to take the blame for this money being here.' Kondub then collected and counted the cash, which totaled $367.85. The defendant also told Kondub that Smith knew about the cash, that Smith had used some of it for a building officials' meet-

ing and, finally, that Smith had authorized the defendant to take some money from the fund to buy flowers for a sick volunteer. Smith stated that he was aware of the cash payments for photocopying, but that he had assumed that the cash was deposited properly, on a regular basis. Smith also acknowledged that he had authorized the defendant to pay for the flowers out of the cash that had been collected for photocopying fees.

"The defendant was terminated from her employment with the department on April 18, 1995. Gough then hired a temporary secretary to go through the manila permit files and prepare a report for fiscal year 1993, listing, inter alia, each permit that had been issued, the issuance date, the fee charged, and whether the file copy had been signed. The report indicated that 2447 permits had been issued for a total of $351,911 in fees. For the same fiscal year, $358,557 in fees had been deposited, representing an excess of approximately $6500." Id., 233–38. The defendant subsequently was arrested and charged with nine counts of forgery in the second degree and three counts of larceny in the second degree. A jury trial thereafter ensued.

Our opinion in *State* v. *DeCaro*, 252 Conn. 229, sets forth the following additional relevant facts and procedural history relative to the defendant's trial. "On January 28, 1997, the second day of trial, the defendant served a subpoena on Smith that directed him to appear in court on that same day and to bring with him certain records and documents. Specifically, the subpoena directed Smith to produce the following three categories of materials:

"A. Any and all operator['s] manuals, procedure guidelines, memorand[a], or written instruments regarding building permit procedure in the . . . [d]epartment from 1993 to 1995.

"B. All computer records of the . . . [d]epartment from the later of Building Permit [No.] 52260 or June 30, 1993 until the present date.

"C. Any correspondence, statements, and/or memoranda to and/or from [the defendant] in possession of the . . . [d]epartment." (Internal quotation marks omitted.) Id., 251.

"The defendant . . . claimed that she had a sixth amendment right to obtain the materials identified in [part A of] the subpoena. [Although the state had moved to quash that portion of the subpoena, the state nevertheless] indicated that it had no objection to the defendant's request for the documents sought thereunder. The trial [court] stated, however: 'I do. [The defendant] is charged with the crimes of [larceny in the second degree and forgery in the second degree]. She is not charged with using a computer improperly or the records didn't jive up right. I think [part] A is irrelevant and immaterial.' The court later stated: '[The defendant] is charged with a very simple charge. She's charged with taking money and falsifying documents. I see no reason to have this court listen to or have the jury have to read operator's manuals [or] procedure guidelines . . . . I'm going to . . . deny [part] A . . . .' " Id., 251–52.

The jury subsequently found the defendant guilty of the forgery charges but not guilty of the larceny charges. The trial court rendered judgment in accordance with the jury verdict, and the defendant appealed,[3] claiming, inter alia,[4] that her sixth amendment rights to confront

---

[3] The defendant appealed from the judgment of conviction to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] In her appeal, the defendant also claimed that (1) the evidence was insufficient to sustain her conviction on the forgery charges, (2) her conviction on the forgery charges must be vacated because that conviction was inconsistent with her acquittal on the larceny charges, and (3) the trial court improperly denied her request for a mistrial or, alternatively, for a curative instruction in response to allegedly improper comments that the senior

witnesses[5] and to compulsory process[6] were violated on the basis of the trial court's decision to quash part A of the subpoena. As we explained in *State* v. *DeCaro,* supra, 252 Conn. 229, the defendant claimed, specifically, that "the trial court improperly [had] quashed part A of the subpoena because the materials sought thereunder, namely, '[a]ny and all operator['s] manuals, procedure guidelines, memorandum[a], or written instruments regarding building permit procedure in the . . . [d]epartment from 1993 to 1995,' were central to her defense and likely would have assisted her in cross-examining the state's witnesses. The defendant emphasize[d] the fact that the forgery charges related directly to her preparation of permits and reports that did not correspond to the payments for the permits. The defendant maintain[ed] . . . that the claimed forgeries were not motivated by any intent to defraud, deceive or injure the town, but, rather, were the result of overwork, disorganization and an honest attempt to reconcile the permits with the checks. According to the defendant, therefore, information as to any written policies cov-

assistant state's attorney had made during closing arguments. *State* v. *DeCaro,* supra, 252 Conn. 232. As we previously have indicated, we rejected each of these claims; id., 239, 242, 245; and, therefore, they are not the subject of this opinion.

[5] "The primary interest secured by confrontation is the right to cross-examination . . . . Compliance with the constitutionally guaranteed right to cross-examination requires that the defendant be allowed to present the jury with facts from which it could appropriately draw inferences relating to the witness' reliability. . . . [P]reclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . [Furthermore], the exclusion of defense evidence may deprive the defendant of his constitutional right to present a defense." (Internal quotation marks omitted.) *State* v. *Brown,* 273 Conn. 330, 338, 869 A.2d 1224 (2005).

[6] "The sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts . . . to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Cerreta,* 260 Conn. 251, 260–61, 796 A.2d 1176 (2002).

ering the practices of the department with respect to permits and accounting was essential to enable her to mount an effective defense and to refute the state's claims. The defendant assert[ed], for example, that she could have used the information requested under part A of the subpoena to substantiate a claim that her conduct was not inconsistent with any formal department policy, whether or not any such policy existed." Id., 255.

The state maintained that the trial court had not abused its discretion in quashing part A of the subpoena because compliance "would have been unduly burdensome"; id.; and because the defendant's request was nothing more than a "fishing expedition." (Internal quotation marks omitted.) Id., 256. The state further maintained that the defendant had made an insufficient showing that the materials sought under part A would have been useful to her defense "because she ha[d] not demonstrated that the department was subject to any written policies or procedures." Id.

After reviewing the applicable legal principles, we concluded that the trial court improperly had quashed part A of the subpoena because the materials sought thereunder were highly relevant to the defendant's claim that her conduct did not violate any official department policy and because the request was sufficiently particularized and not unduly burdensome. See id., 258. We then stated: "Nevertheless, on the present record, we cannot determine whether the trial court's decision to quash part A of the subpoena violated the defendant's constitutionally protected rights under the compulsory process or confrontation clauses. Because the trial court prohibited the defendant from obtaining the materials sought under part A of the subpoena, we do not know whether any such materials exist. If such written policies and procedures do exist, we do not know the extent to which they may support the defendant's claim that her conduct, though sloppy or negli-

gent, was not criminal. Moreover, we do not know whether the defendant followed some or all of the policies, or none at all. In the absence of such facts, we cannot determine the harm, if any, [that the defendant suffered] as a result of the failure to produce those written policies and procedures. On the other hand, if the department maintained no such written guidelines, then the defendant still must demonstrate that the trial court's decision to quash part A of the subpoena so inhibited her ability to establish that fact, notwithstanding other evidence of the absence of any written policies or procedures . . . that she is entitled to a new trial.[7]

"Under the circumstances, therefore, we are persuaded that an initial determination of the foregoing issues should be made by the trial court, which will have the opportunity to do so on the basis of a full factual record developed after a hearing. Thereafter, the parties will be able to present to this court whatever arguments may be appropriate regarding whether the defendant's sixth amendment rights were violated and whether she suffered harm as a result of the trial court's decision to quash part A of the subpoena issued to Smith." (Citation omitted.) Id., 258–59. Accordingly, we remanded the case to the trial court for a hearing on the issues raised by that court's decision to quash part A of the subpoena.

At that hearing, the senior assistant state's attorney (state's attorney) informed the trial court that, notwithstanding the court's decision to quash part A of the subpoena, the town, at the direction of the state's attorney, had, in fact, complied in a timely manner with part A of the subpoena. Specifically, the state's attorney

---

[7] With respect to our observation regarding the "other evidence of the absence of any written policies or procedures"; State v. DeCaro, supra, 252 Conn. 259; we noted that Smith had testified that "he was unaware of any [such] policies or procedures." Id., 256 n.23; see also footnote 11 of this opinion.

explained that he had requested that the town provide him with the documents sought under that portion of the subpoena. The town did so, and the state's attorney then made those documents available to defense counsel. Associates of defense counsel's firm reviewed them in the state's attorney's office. The state's attorney also informed the court that defense counsel had been provided with those documents in advance of his cross-examination of Smith and that certain of those documents had been introduced into evidence by the defense.[8] Although defense counsel agreed with the state's attorney's representations, he maintained that the defendant nevertheless was entitled to a new trial because the trial court's decision to quash part A of the subpoena had compromised the defendant's ability to establish that the department had no written policies or procedures regarding the processing of building permits.[9] Following the hearing, the trial court determined that part A of the subpoena had been complied with and, therefore, that no further action by the trial court was necessary.

Thereafter, we ordered the parties to file supplemental briefs with respect to whether, in view of the facts and circumstances adduced at the hearing, the judgment of conviction should be affirmed.[10] In her brief,

[8] With respect to the materials produced in accordance with part A of the subpoena, the state's attorney identified ten full exhibits that the defendant had introduced into evidence and two exhibits that had been marked for identification only.

[9] The defendant also argued that, because none of the documents produced under part A of the subpoena was written material setting forth the department's policies and procedures regarding the processing of building permits, the trial court was required, pursuant to our earlier opinion in *DeCaro*, to make an express finding as to whether its decision to quash part A of the subpoena had, in fact, compromised the defendant's ability to establish the nonexistence of those policies. The court, however, declined to make any such finding.

[10] Neither the state nor the defendant requested oral argument on that issue, and we did not order it.

the defendant maintains that she is entitled to a new trial because, regardless of whether the defense actually received the documents sought under part A of the subpoena, her sixth amendment rights were violated on the basis of the trial court's decision to quash part A of the subpoena. In particular, the defendant contends that the court's decision to quash unduly compromised her ability to ask certain questions regarding the subpoenaed documents, including whether written policies existed with respect to the department's building permit procedures and, if so, why they had not been produced. The defendant further asserts that the opportunity to have engaged in such questioning likely would have bolstered her defense by making it more possible for her to have discredited one or more of the state's witnesses. The state counters that the defendant's constitutional rights were not violated because the defendant did receive the subpoenaed documents and because, at trial, defense counsel was afforded an opportunity to inquire—and did inquire of Smith in particular—about the department's policies and procedures concerning the processing of building permits.[11]

---

[11] The following is an excerpt of defense counsel's cross-examination of Smith regarding the documents that were the subject of part A of the subpoena.

"[Defense Counsel]: And where was—by the way, you received a subpoena prior to coming here today from the defense, did you not?

"[Smith]: Yes.

"[Defense Counsel]: And on the day that you got the subpoena, you were asked to search for policies and procedures in connection with the handling of cash and you were asked—yes, Your Honor, paragraph A.

"[State's Attorney]: I am going to object, Your Honor. You struck that.

"The Court: I ruled against [the defendant] on those."

Whereupon the jury was excused.

"[Defense Counsel]: But what I am asking the witness is, whether he was called [on] to produce those things and whether, in review of his records, he came up with anything, and then I am going to ask him what those procedures are. I'm not going to call for the documents, and he is under no obligation to have brought them here. I am aware of the court's [decision to quash part A of the subpoena]. I am also aware of what I am entitled to ask this man under cross-examination, direct examination having focused for a good bit of it, on the policies and procedures of the department.

We agree with the state that, under the circumstances, the defendant suffered no deprivation of her sixth amendment rights. It is undisputed that the defendant received, in a timely manner, the documents that she sought under part A of the subpoena. Moreover, defense counsel had an opportunity to cross-examine the state's witnesses concerning their knowledge of written policies or procedures concerning the processing of building permits, and defense counsel took advantage of that opportunity in connection with his cross-examination of Smith. See footnote 11 of this opinion. Thus, even though the trial court had quashed part A of the subpoena, there is nothing in the record to indicate that the court limited the defendant's inquiry into the existence or nonexistence of such written policies or procedures; indeed, as defense counsel's cross-examination of Smith reflects, the court did not do so. The record also contains no suggestion that the court would have limited the defendant's opportunity to call any witness or witnesses of her choosing for the pur-

---

"[State's Attorney]: But he's not entitled to phrase his question as if this man is obligated to bring that stuff here today, which is what he was doing.

"The Court: I agree with you. There's no question, [defense counsel], that you can ask him all about the procedures in the building department.

"[Defense Counsel]: And I can ask him whether yesterday, before [3 p.m.], he was looking for those documents.

"The Court: I think you can ask that, too. But I think that it is unfair, it's prejudicial in my mind to the jury, to bring up a subpoena which I've ruled on.

"[Defense Counsel]: I will not ask that question, Your Honor. Thank you."

Whereupon the jury was brought back into the courtroom.

"[Defense Counsel]: Does the department of building official of the town . . . back in 1993, 1994, did it have any policies or procedures for the handling of money taken?

"[Smith]: Written policies?

"[Defense Counsel]: Yes.

"[Smith]: I'm not aware of any."

We note that, although defense counsel continued to question Smith generally about the manner in which the department handled refunds and deposits and about some documents pertaining to computer problems that had been produced pursuant to the subpoena, he did not question Smith further about the department's written policies and procedures regarding building permits.

pose of making that same inquiry. Aside from the defendant's unsubstantiated and speculative assertion that the trial court's decision to quash part A of the subpoena compromised defense counsel's cross-examination of one or more of the state's witnesses, the defendant has identified no harm that even arguably resulted from that decision to quash part A of the subpoena.[12] Indeed, because of the defendant's timely receipt of the documents that she had sought under part A of the subpoena, and because the trial court did not prohibit or otherwise limit the defendant's opportunity to adduce testimony concerning the procedures and policies that were the subject of that portion of the subpoena, we can conceive of no harm that could have flowed from the court's decision to quash. Consequently, the defendant was not deprived of her sixth amendment rights to confront witnesses and to compulsory process.

The judgment is affirmed.

In this opinion BORDEN, NORCOTT and KATZ, Js., concurred.

MCDONALD, J., dissenting. I continue to adhere to my dissent in *State* v. *DeCaro*, 252 Conn. 229, 745 A.2d 800 (2000). In that case, I would have ordered a new trial upon a finding that the trial court improperly quashed the defendant's subpoena seeking highly relevant written building permit procedures and guidelines. The majority, to the contrary, ordered a further hearing before the trial court, which was held in 2001.

---

[12] The thrust of the defendant's claim appears to be that the trial court's decision to quash part A of the subpoena limited her ability to establish that the department had no written procedures or policies concerning the processing of building permits. As we have explained, the defendant has provided no persuasive argument to support her contention. We note, moreover, that the record is devoid of any evidence to suggest that the department had any such procedures or policies; indeed, the evidence bearing on that question quite clearly is to the contrary. See footnote 11 of this opinion.

The majority now holds that the quashing of the sub-poena was harmless because the defendant, Rita DeCaro, did not dispute receiving the requested material from the senior assistant state's attorney (state's attorney). I disagree because there is a real difference between obtaining all of the town's documents on the subject directly from the town building supervisor by subpoena and acquiring from the state's attorney all of the documents that, upon the state's attorney's request, the town gave to the state's attorney. Simply because the state's attorney gave the defendant all of the documents that the state's attorney had received does not mean that the town necessarily turned over everything it had. Defense counsel stated to the trial court in 2001 that the documents made available to the defendant "seemed to be in compliance," and that he had "no factual basis on which to dispute" the state's attorney's representation and therefore accepted it. Defense counsel also stated, however, that he did not know whether he "did" or "didn't" receive all of the information. Because the defendant did not refute the state's attorney's representations regarding the subpoenaed documents, the court found that there was full compliance with the subpoena. This was not a reasonable finding as the defendant could not dispute the town's full compliance without a subpoena and cross-examination of town officials. The defendant faced a "Catch-22"[1] from which there was no escape.

Donald Miklus, the town controller, testified before the jury that there had been adequate cash and check management controls in place. The defendant nevertheless was restricted from asking Stephen Smith, the defendant's supervisor, before the jury whether he, in

---

[1] Catch-22 is defined as "[a] situation in which a desired outcome or solution is impossible to attain because of a set of inherently illogical rules or conditions . . . ." American Heritage Dictionary of the English Language (4th Ed. 2000).

response to the subpoena, had searched for and found any written building procedures or guidelines regarding the handling of cash. Thus, no evidence was presented to the jury from the witness under subpoena to produce such records to show that no such written procedures or guidelines existed.[2] Smith testified before the jury only that he was "not aware" of any written policies or procedures, thus giving an equivocal answer.[3] Documents that are not produced when required by subpoena would be, of course, the strongest evidence of their nonexistence. I would conclude that the defendant was entitled to present such testimony and was prejudiced because she could not.

It cannot be claimed that disclosure by the state is a bar to a subpoena seeking the material to be presented to the jury. I would conclude that the sixth amendment guarantee of the right to compulsory process for obtaining witnesses in a criminal defendant's favor was not met by such disclosure of documents obtained from a secondary source not subject to the subpoena.

I would finally conclude that the restrictions on compulsory process deprived the defendant of testimony from witnesses that plausibly would have been material and favorable to her defense. See, e.g., *United States* v. *Valenzuela-Bernal*, 458 U.S. 858, 868, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). Accordingly, I would order a new trial.

---

[2] Defense counsel stated at the 2001 hearing that there were no such procedures or guidelines in the disclosed material, and the court stated that it would have to "bother" the state's attorney about that, after which the state's attorney did not reply or dispute defense counsel's statement.

[3] See footnote 11 of the majority opinion.